**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**NOT FOR PUBLICATION**

| | |
|---|---|
| SCHERING-PLOUGH CORPORATION, | |
| Plaintiff, | |
| v. | Civ. Action No. 05-2575 (KSH) |
| UNITED STATES OF AMERICA, | |
| Defendant | **OPINION** |

**KATHARINE S. HAYDEN, U.S.D.J.**

**I. INTRODUCTION**

Schering-Plough filed this suit against the United States for a refund of $473 million of federal income taxes and interest.  The complaint recites several grounds for refund, one of which, Paragraph 29, reads as follows:

> Schering-Plough's sales of portions of the notional principal contracts to Scherico and Limited may not be recharacterized for federal income tax purposes as "loans" or as "constructive dividends," because the I.R.S. may not deny equality of treatment to Schering-Plough and unfairly treat Schering-Plough inconsistently with its treatment of other similarly situated taxpayers. Whether or not Schering-Plough's sales of portions of the notional principal contracts to Scherico and Limited could be recharacterized for federal income tax purposes as "loans" or as "constructive dividends" as asserted by the I.R.S. in the Notice of Deficiency (which Schering-Plough denies), the transactions would not subject Schering-Plough to tax, because the I.R.S. may not deny equality of treatment to Schering-Plough and unfairly treat Schering-Plough inconsistently with its treatment of other similarly situated taxpayers. The I.R.S. abused its discretion in discriminating against Schering-Plough by allowing other similarly situated taxpayers to report lump sum payments received upon their sales of portions of notional principal contracts as income over the remaining terms of the contracts, while denying the same treatment to Schering-Plough.

(Compl. ¶ 29.)  The government has filed a motion for summary judgment on this claim, which the

1

parties have characterized as the "disparate treatment" claim.[1]

The claim led to several discovery disputes upon which Magistrate Judge Shwartz has made rulings. Schering-Plough has appealed some of these rulings, arguing that certain individuals with information related to the Internal Revenue Service's ("IRS") decision-making on the transactions at issue here should be fully deposed and that the IRS should disclose certain documents related to these transactions. (Docket entry # 105.) The government also appealed Judge Falk's without-prejudice denial of the government's request for a determination that Schering-Plough had waived the attorney-client privilege as to all documents related to communications between Schering-Plough and Skadden Arps Slate Meagher & Flom LLP regarding the transactions at issue here. (Docket entry # 62.) Schering-Plough has also filed a motion to bifurcate the disparate treatment claim from the rest of the triable issues in this case.

## II. BACKGROUND

In 1991, Schering-Plough entered into an interest rate swap transaction with Algemene Bank Nederland, N.V. ("ABN"). (Compl. ¶ 16.) In an interest rate swap transaction, the parties agree to make interest payments to each other based on a hypothetical amount of principal. (Compl. ¶ 5.) Each party agrees to make payments under a different interest rate for a set term of years. (Id.) The parties only exchange the interest payments, not the principal amount. (Id.) Schering-Plough's transaction with ABN called for each party to make payments every 6 months from 1991 until 2010, based on a principal amount of $650 million. (Compl. ¶ 16.) The agreement called for Schering-Plough to pay ABN interest based upon the London Interbank Offered Rate ("LIBOR"), while ABN would pay Schering-Plough interest based on the federal fund rate. (Id.)

Schering-Plough claims it relied on IRS Notice 89-21 when making these transactions, which

---

1 The government asserts the Court should dismiss the disparate treatment claim because Schering-Plough fails to state a claim upon which relief can be granted. The government styled their motion as a summary judgment motion under Rule 56, as opposed to a motion to dismiss under Rule 12(b)(6), because the government uses some averments outside of the pleadings, such as Schering-Plough's failure to seek a private letter ruling regarding the transactions at issue here. (Gov't Br. in support of opposition to Schering-Plough's Magistrate Appeal 5 n.3.)

provided that:

> if a taxpayer entered into an interest rate swap contract and received a lump sum payment in one year for the right to receive payments under the swap contract in future years, that lump sum payment must be reported as income spread over those future years of the swap contract, and must not be reported as income in a lump sum in the year the payment was received.

(Id.)

Schering-Plough assigned a substantial portion of its right to receive payments from these transactions to two of its foreign subsidiaries, who paid $246,400,000 for the assignment. (Compl. ¶¶ 17, 18.) Schering-Plough reported as income a ratable portion of this payment on its 1991 federal income tax return. (Compl. ¶¶ 17, 18.)

In 1992, Schering-Plough entered into a second interest rate swap with ABN. (Compl. ¶ 20.) It assigned a substantial portion of its right to receive payments from the 1992 interest rate swaps to one of its foreign subsidiaries, who paid $444,000,000 for the assignment. (Compl. ¶ 21) Schering-Plough reported a ratable portion of this payment as income on its 1992 federal income tax return. (Compl. ¶ 21.)

An unrelated taxpayer ("First Taxpayer"), who is a direct competitor to Schering-Plough, entered into a transaction that was identical in all material respects to the swap and assignment transactions entered into by Schering-Plough. (Gov't's Statement of Material Facts ¶¶ A, B.) IRS auditors sought legal advice about First Taxpayer's swap and assignment transaction from the IRS's Office of the Chief Counsel, which was given in the form of a Field Service Advice Memorandum ("FSA"). (Schering-Plough's Statement of Material Facts ¶¶ 4 and 5.) The Commissioner of the IRS determined that IRS Notice 89-21 applied, and "therefore First Taxpayers transaction was not taxable in the year in which it was executed." (Gov't's Statement of Material Facts ¶ C.) See also 1997 FSA LEXIS 206 (Aug. 29 1997). IRS auditors for Schering-Plough had also requested legal advice about swap and assignment transactions from the Office of the Chief Counsel. (Schering-Plough's Statement of Material Facts ¶ 7.)

As the parties explain it:

3

> Notice 89-21 was in effect until the IRS adopted new regulations in 1993. Those new regulations reversed the basic conclusion of Notice 89-21, and provided that such a lump-sum payment may be recharacterized as a "loan" that is reported as income in the year received under 26 U.S.C. section 956. See Treas. Reg. § 1.446-3(g)(4).

(Ltr. from Schering-Plough and Gov't to Judge Shwartz, April 13, 2007 (docket entry # 94).)  While Schering-Plough, as part of this lawsuit, disputes this new characterization, the significant fact related to the disparate treatment claim is that the IRS applied the regulations retroactively. As a result, Schering-Plough was required to pay $473 million in tax and interest on the swap and assignment transactions. This lawsuit pursuant to 28 U.S.C. § 1346(a) followed.

The complaint, the parties agree, can be divided into two grounds for refund: that the IRS mischaracterized the sales of contracts to the subsidiaries as "loans" or "constructive dividends" subject to taxation, (Compl. ¶¶ 27-28.)  And second, that the IRS treated similarly situated taxpayers in a different manner "by allowing other similarly situated taxpayers to report lump sum payments received upon their sales of portions of notional principal contracts as income over the remaining terms of the contracts, while denying the same treatment to Schering-Plough." (Compl. ¶ 29.)  The Court first addresses the government's dispositive motion on this claim because it is central to the pending magistrate appeals.

### III. STANDARD

Summary judgment is appropriate where there is no genuine issue of material fact to be resolved and the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Alcoa, Inc. v. United States, No. 06-1635, 2007 U.S. App. LEXIS 27559, *4 (3d Cir. Nov. 28, 2007). As earlier indicated, it is the government's position in the dispositive motion that the disparate treatment claim fails as a matter of law.

### IV. DISCUSSION

The government makes two arguments:  Schering-Plough's disparate treatment claim is not a cognizable cause of action; and in any event, Schering-Plough cannot bring a disparate treatment claim

because it never requested a ruling from the IRS.

Schering-Plough bases its disparate treatment claim in large part on a decision from the Court of Claims, <u>International Business Machines Corp. v. United States</u>, 343 F.2d 914 (Ct. Cl. 1965), <u>cert</u> <u>denied</u> 382 U.S. 1028 (1966) (hereinafter "<u>IBM</u>"). Careful attention to the holding is pertinent, especially since the parties dispute its precedential value.

IBM and Remington Rand were competitors in the computer industry and both companies had been paying an excise tax imposed upon "business machines." <u>IBM</u>, 343 F.2d at 915-916. Remington Rand asked the IRS for a private letter ruling that some of its computers were not subject to the excise tax. <u>Id.</u> at 916. Two days later the IRS issued a ruling to that effect. After learning about the ruling, IBM requested a similar ruling for its computers, which were identical. The IRS did not act on IBM's request for over two years. Subsequently, the IRS revoked the favorable ruling it gave Remington Rand and concluded that its computers <u>were</u> subject to the excise tax, applying the new interpretation prospectively. The IRS ruled that the same interpretation would apply to IBM, but it applied the interpretation <u>retroactively</u>. <u>Id.</u>

IBM sued the government for a refund of the excise taxes it paid between the date it requested a ruling and the date the ruling was made, the same period that Remington Rand was not required to pay excise taxes for its computers. <u>Id.</u> at 917. IBM argued that the unequal treatment it received invalidated the tax during this period. <u>Id.</u>

The analysis in <u>IBM</u> evolved out of the court's reaction to the position taken by the government.

> In defending on the merits, the Government invokes a set of simple propositions: Since the taxpayer concedes that its equipment is a 'business machine' under Section 3406(a)(6) of the 1939 Code and Section 4191 of the 1954 Code, the consequence must be that the tax was properly imposed, that there was no overpayment, and that no refund can be had; moreover, this taxpayer cannot rely on the erroneous private ruling given in April 1955 to Remington Rand, a separate taxpayer, and similarly the Government is not bound, in its relations with this taxpayer, by that incorrect <u>ad</u> <u>hoc</u> interpretation. The leitmotif of this defense is that taxpayers can never avoid liability for a proper tax by showing that others have been treated generously, leniently, or erroneously by the Internal Revenue Service—each individual must rest, in every

5

instance, on the validity of his own position, under the applicable taxing provision, independently of the others.

Though our tax law often takes that stance (see, e.g., Hanover Bank v. Commissioner of Internal Revenue, 369 U.S. 672, 686, 82 S.Ct. 1080, 8 L.Ed.2d 187 (1962)), the rule is not universal.  Congress can direct the Service and the courts to take account, in a specified area, of discrimination, of equality of treatment, and of the tax burdens imposed on competitors or persons in the same or a comparable situation. Where that is what Congress has declared, the policy of the tax law emphasizes, in that particular sector more than in the rest of the tax field, the component of equal treatment; courts are then bound to vindicate that special interest just as they are, generally, to see that the uniform taxes Congress has sought to levy are paid. Curbing tax collection in the interest of equality, where Congress has so decreed, is as much a part of the internal revenue laws as the affirmative exaction of taxes. As Judge Learned Hand said in a similar connection, "the notion that the 'policy of a statute' does not inhere as much in its limitations as in its affirmations, is untenable." Borella v. Borden Co., 145 F.2d 63, 65 (C.A. 2, 1944), aff'd, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865 (1945).

Id. at 919 (footnote omitted).

Applying its rejection of a "universal" power to tax irrespective of the impact on other taxpayers, the court examined Section 7805(b) of the Internal Revenue Code, which provided: "The Secretary or his delegate may prescribe the extent, if any, to which any ruling or regulation, relating to the internal laws, shall be applied without retroactive effect." Id. (internal quotations omitted).  The court determined that when Congress gave the Commissioner the discretion to apply rulings prospectively it also implicitly provided that the exercise of that discretion would be reviewable for abuse.  Id. at 920.  The court ultimately held that prospective application to Remington Rand and retrospective application to IBM of the same ruling constituted an abuse of discretion.

Notwithstanding the outcome in IBM, the government claims the later holding in Dickman v. Commissioner, 465 U.S. 330 (1984), forecloses disparate treatment claims.  In Dickman, several taxpayers argued that the IRS should not be able to assess gift tax liability on certain loans because "such a position represents a departure from prior Internal Revenue Service Practice." Id. at 342.  The thrust of the taxpayers' argument was their detrimental reliance on those prior rulings.  The argument failed.

Even accepting the notion that the Commissioner's present position represents a departure from prior administrative practice, which is by no means certain, it is well

> established that the Commissioner may change an earlier interpretation of the law, even if such a change is made retroactive in effect. E.g., Dixon v. United States, 381 U.S. 68, 72-75, 85 S.Ct. 1301, 1304-1306, 14 L.Ed.2d 223 (1965); Automobile Club of Michigan v. Commissioner, 353 U.S. 180, 183-184, 77 S.Ct. 707, 709-710, 1 L.Ed.2d 746 (1957). This rule applies even though a taxpayer may have relied to his detriment upon the Commissioner's prior position. Dixon v. United States, supra, 381 U.S., at 73, 85 S.Ct., at 1304. The Commissioner is under no duty to assert a particular position as soon as the statute authorizes such an interpretation. See also Bob Jones University v. United States, 461 U.S. 574, 103 S.Ct. 2017, 76 L.Ed.2d 157 (1983). Accordingly, petitioners' "taxpayer reliance" argument is unavailing.

Id. at 343 (footnotes omitted).  According to the government, Dickman must be interpreted so as to foreclose Schering-Plough's claims arising out of Paragraph 29.

Dickman holds that the IRS cannot be barred from collecting a tax that is lawfully due solely because it previously made an erroneous decision.  The reasoning arises from the Court's earlier ruling in Dixon v. United States, 381 U.S. 68 (1965), that "the Commissioner's acquiescence in an erroneous decision, published as a ruling, cannot in and of itself bar the United States from collecting a tax otherwise lawfully due."  It follows that the IRS is not required to apply an erroneous interpretation of the law simply because it previously made an erroneous interpretation with respect to another taxpayer.  "The making of an error in one case, if error it was, gives other taxpayers no right to its perpetuation." Sirbo Holdings, Inc. v. Commissioner, 509 F.2d 1220, 1222 (2d Cir. 1975).

This conclusion is the basis for the decision in the Eighth Circuit in  Peerless Corp. v. United States, 185 F.3d 922 (8th Cir. 1999), holding that Dickman forecloses disparate treatment claims that are based on the reasoning in IBM.  Peerless Corporation relied on a private letter ruling issued to another taxpayer to claim an excise tax exemption on its manufactured trailer bodies.  Id. at 924-25.  The trial court found in favor of the government and ordered Peerless Corporation to pay $430,000 in taxes and interest.  Id. at 925.

Peerless moved for a new trial, arguing disparate treatment even though it had never advanced the theory during the trial.  Its argument relied on IBM.  Soundly criticizing Peerless's "eleventh hour" effort, the Eighth Circuit nonetheless rejected it (as soundly) on two substantive bases:

[T]here was a much greater reliance factor in <u>I.B.M.</u> since I.B.M. . . . within three months after the private ruling to Remington had made an urgent request for a similar ruling." <u>Id.</u> Here, Peerless never requested a private letter ruling regarding its own trailers. Thus, Peerless's case "is entirely different [from <u>IBM</u>] since [Peerless] was treated no differently from many other similarly situated taxpayers who also had not sought rulings." <u>Id.</u>; <u>see</u> <u>also</u> <u>Bornstein</u>, 345 F.2d at 564 n. 2 (distinguishing the case at bar from <u>IBM</u> on the basis that "none of the taxpayers nor the corporations in which they are shareholders asked for rulings").

Finally, Peerless's position is foreclosed by our determination <u>supra</u> that private letter rulings lack precedential value, and by the Supreme Court's ruling that the IRS is free to change an earlier interpretation of the Internal Revenue Code despite detrimental reliance by a taxpayer on the Service's prior position, <u>see Dickman v. Commissioner</u>, 465 U.S. 330, 343, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984); <u>cf. Geotel, Inc. v. United States</u>, 75-2 U.S. Tax Cas. (CCH) ¶ 16,201, 1975 WL 752 (E.D.N.Y. Oct.1, 1975) (distinguishing <u>IBM</u> and stating that "taxpayers can never avoid liability for a proper tax by showing that others have been treated generously, leniently, or erroneously by the Internal Revenue Service" (internal quotation omitted)).

<u>Id.</u> at 929.

In opposing an application here of <u>Dickman</u>'s broad pronouncement that a "taxpayer's reliance argument is unavailing," <u>id.</u> at 343, Schering-Plough argues that if the Court "had intended to overrule or limit <u>IBM</u> 20 years later in <u>Dickman</u>, one might have expected the Court to discuss <u>IBM</u>. Or perhaps cite to it. The Court did neither." (Opp'n. Br. 14.)  For support that <u>IBM</u> remains viable, Schering-Plough points to cases that entertain a disparate treatment claim.  But only three of those cases were decided post <u>Dickman</u>.  (Opp'n. Br. 12.)  And two of them do not mention <u>Dickman</u>.  <u>See Oshkosh Truck Corp. v. United States</u>, 123 F.3d 1477 (Fed. Cir. 1997); <u>Gateway Equipment Corp. v. United States</u>, 247 F. Supp. 2d 299 (W.D.N.Y. 2003).

It appears that only one case cited held a disparate treatment claim viable after <u>Dickman</u>.  In <u>Computer Sciences Corp. v. United States</u>, 50 Fed. Cl. 388 (Ct. Cl. 2001), the Court of Claims noted that while the IRS is entitled to change its position on an issue of law, the "IRS's decision to act retroactively must be a rational one and is subject to review for abuse of discretion."  <u>Id.</u> at 293.  But the same court quickly criticized this position in <u>Vons Cos. v. United States</u>, 51 Fed. Cl. 1, 10 n.10 (Ct. Cl. 2001)(noting that the <u>Computer Sciences</u> court read <u>IBM</u> too broadly and that precedent rejects the idea that "the law

8

that the Congress actually enacts can be short-circuited and disregarded any time the IRS has afforded a single taxpayer or even a group of taxpayers treatment more favorable than the law provides."). Schering-Plough fails to convince the Court that a disparate treatment claim is still viable under the facts presented here.  While the comfort of a case on point in the Third Circuit is lacking, this Court is persuaded by the language in <u>Dickman</u> and the commentary on <u>IBM</u> appearing in later cases that the disparate treatment claim advanced here fails as a matter of law.

While not required to address the government's alternative argument, the Court notes that factually, Schering-Plough is not particularly well-positioned to seek application of <u>IBM</u>.  As the government argues, "[e]ven assuming <u>IBM</u> retains any vitality Schering-Plough's disparate treatment claim fails because the IRS neither issued, nor revoked, any 'ruling' on this matter under 26 U.S.C. § 7805(b)."  (Gov't Br. 13.)  The decision in <u>IBM</u> was based on both companies having requested private letter rulings within months of each other.  Indeed, IBM's request was made as "urgent."  The response by IRS took two years.  On this template, the court examined for an abuse of discretion.  And the factual background was apparently significant to the Court of Claims, which commented in <u>Bornstein v. United States</u>, 345 F.2d 558 (Ct. Cl. 1965), decided one month later, that the its holding in <u>IBM</u> depended on the fact that both taxpayers had requested private letter rulings from the IRS.  A reading of <u>Bornstein</u> reveals that it holds <u>IBM</u> closely to its facts, which is significant because Schering-Plough did not request a private letter ruling ("PLR") from the IRS.

On this point, Schering-Plough argues that the field service advice memoranda ("FSA"), common to both it and the First Taxpayer, should be considered rulings under Section 7805(b).  The government disputes this.  First, the Court looks to the definition of a ruling in the Code of Federal Regulations:  "A ruling is a written statement issued to a taxpayer or his authorized representative by the [IRS] National Office which interprets and applies the tax laws to a specific set of facts."  26 C.F.R. § 601.201(a)(2).

Along with this definition, which on its face appears to distinguish a ruling from a FSA, there is a

helpful distinction made in a decision of the D.C. Circuit. <u>Tax Analysts v. IRS</u>, 117 F.3d 607, 608-09, 615-17 (D.C. Cir. 1997). In that case, FSAs were distinguished from other written determinations in order to determine whether they were subject to disclosure under the Freedom of Information Act. This decisions pointed out that FSAs are not issued to the taxpayer; they are issued to IRS field personnel whereas a taxpayer requests a PLR. 26 C.F.R. § 601.201(e); <u>Tax Analysts</u>, 117 F.3d at 608. Second, a taxpayer who requests a PLR can rely on it because the ruling is binding on the IRS with respect to that taxpayer. 26 C.F.R. § 601.201(l); 26 U.S.C. § 6110(k)(3). FSAs cannot be relied upon by taxpayers because they are not binding on the IRS. 26 U.S.C. § 6110(k)(3); <u>Tax Analysts</u>, 117 F.3d at 616-617. Third, when taxpayers submit requests for PLRs they submit information to the IRS and they are entitled to have a conference with the IRS. 26 C.F.R. §§ 601.201(e)(1), (e)(2), (e)(10), (f). In contrast, FSAs are issued without notice to the taxpayer and the taxpayer has no right to a conference with the IRS. <u>Tax Analysts</u>, 117 F.3d at 616. Fourth, when the IRS modifies or revokes a PLR, the Commissioner has the discretionary authority under § 7805(b) to limit the retroactive effect of the modification or revocation. 26 C.F.R. § 601.201(l)(1).

The reasoning in <u>Tax Analysts</u> appears persuasive, and more to the point, making the distinction between FSAs and PLRs presupposes that the Court is engaged in an abuse of discretion review of the IRS decision to apply its ruling retroactively to Schering-Plough pursuant to Section 7805(b). That review will not take place based on the Court's conclusion that Schering-Plough's disparate treatment claim is foreclosed.

### V. Conclusion

The government's motion for partial summary judgment (docket entry # 46) is granted. Schering-Plough's motion to bifurcate (docket entry # 53) is dismissed as moot. Schering-Plough's objections to Magistrate Judge Shwartz's discovery rulings (docket entry # 105) are dismissed as moot as well; the objections concerned discovery rulings that accepted, for purposes of argument, that the

disparate treatment claim was viable.  The Court will enter an appropriate order.

Anticipating that counsel will be present for a status conference, the Court will explore the continued applicability of Judge Falk's ruling on waiver and make an appropriate decision on the government's appeal.

Date:   12/3/07                                        /s/Katharine S. Hayden

                                                       Katharine S. Hayden
                                                       United States District Judge

11